We will start with the first case on calendar. I see counsel here. Good morning. Hyman v. Brown. Good morning. Good morning, Your Honors. Ranjana Piplani for the Queens County District Attorney and the State. Your Honor, the District Court's decision here was wrong on both issues, but I'd like to start my discussion with the constitutional issue because it is dispositive in favor of the State here. Under AEDPA, the District Court owed the State Court's decision difference in its holding and its factual findings, but the District Court determined that that was unwarranted here. That was error, which it compounded by making its own erroneous factual findings that were wholly unsupported by the record. There were two factual findings, and they were critical to its merits analysis. The first one was that there was actually a link between this purported fee dispute between the investigator and counsel and counsel's performance. The only source of that suggestion was the affidavit of Petitioner's father, who, of course, had no knowledge of the inner workings of counsel's mind and stated— Mr. Hinkson said he never got it. That's true, Your Honor, but Petitioner still had to— Experts who don't get paid don't do the work. What he had to show was that there was a link between counsel's decision not to use Hinkson's evidence, not to use the photographs and the videotape, and this fee dispute. He didn't show that. All he said was that it was his personal belief that that was the reason Hinkson wasn't called. There was no affidavit from counsel, as the district court noted. There was no statement that— Was Hinkson just wrong? I mean, it looks like from all the photos that we've seen, you can see from those windows, the third floor, second floor, first floor, to the crime scene right across from the Friendly Market. Yes. All the shell casings are there in the middle of the road right there. I mean, how could Hinkson be wrong about it when he said, You couldn't see the crime scene from where she said she saw it, but all the photos that have been submitted seem to show he's wrong. Wasn't this a big deal in the state habeas, that Hinkson was just wrong? Hinkson was just wrong. You're absolutely right, Your Honor, which brings me to my second point. The state—I'm sorry. The photographs— Why would he be wrong, though? I mean, how is it a former New York City police officer is hired as an investigator, looks out the window, videos it, takes still photos, comes in and says, You can't see the crime scene from where she said she saw it. How would you make that mistake? Well, he's a paid investigator for the defense. I'm not suggesting that he would lie about something like that, but he knows who he's working for, and his opinion is going to be skewed in favor of the defendant, the petitioner. But as you pointed out, if you look at the photographs that were submitted to the state court, it's clear that you can see out that window. You can see across the street to the Friendly's Market, which so many— It's very muddy, but you can—number 10, I think, you can see the Friendly's Market. Yes. And I don't know what there is in the muddy part of it. It's all sort of blacked out, but it would seem that you can see the street. That's correct. And that could be—why should—well, I guess you would argue that we should assume that the state courts, having seen that, I think on the 440 petition, concluded that Hingston's evidence would not have assisted, and that therefore that's why the lawyer didn't use it. Correct. And that was apparent from the record, Your Honor. So the state court's decision in that regard was correct and was warranted deference by the federal court. Why wasn't Brett Schneider asked that question? There's no—one of the missing things here is anything from him is why didn't you put Hingston on the stand? Why didn't you use those photographs, putting aside the fee dispute? We don't know. I mean, we surmised that maybe he disagreed with Hingston's sightline view, but why wasn't—why wasn't there anything from Brett Schneider in this record? First of all, it's the petitioner's burden. It was his burden in the state court to make out his claim, and it's his burden in the habeas court to make out his claim. As you know, in the federal hearing, there could be no testimony about the constitutional claim because it was limited to the gateway claim of actual innocence. So there could be no testimony about—from Brett Schneider about why he did or didn't call counsel, but his reasons are apparent from the record. You don't need to hear from him to see that had he introduced those photographs, it would have filled a gap in the people's case because the people didn't introduce a photograph showing the view from the window out. What they introduced was a photograph, a crime scene photograph from the street looking up to the window, and it would have together made a complete picture of what the witness said she saw and where she saw it from. The state did introduce a similar photograph at the federal gateway hearing, which confirmed the correctness of the state court decision that counsel wasn't ineffective for not using this evidence. The federal court should not have reached this issue in the first place because Petitioner failed to establish his actual innocence. And I mean his actual innocence, that he was factually innocent, did not commit the crime, did not participate in the shooting, the shootout between two gangs on the— He did. What gun did he use? It doesn't matter what gun he used, Your Honor. It matters that he had to use a gun if he participated in a shooting. And if you look at the shell casings, if one considers the shell casings, four guns were used. One was dropped from the window by Whitmore. Two were in his trunk. And the fourth one not recovered, but the shell casings were in the middle of the street, which is not where Mr. Hyman was. But he didn't have to use a gun to be guilty, Your Honor, because he was charged as a principal and an accomplice under a traditional depraved indifference theory. And a jury could also find him guilty under a killing fields theory. The issue is that he was using one of the guns, either the .45 or the 9mm, because those were the shell casings from the middle of the street. But your position is that he was using one of those guns to fire at Whitmore. Well, you can't figure out how those guns ended up in Whitmore's car later on. Isn't that your position? Well, that was the position at trial, but the actual innocence inquiry is different. It's whether or not he's actually innocent of the crime. And the crime he was charged with was acting in concert. So because he can't show that he's innocent of participating in this shootout because, of course, his statements put him right in the middle of the shootout and describe an ambush that no other evidence shows occurred. Let me be sure I understand your position on this because I'm going to ask your adversary to address it. They didn't offer evidence that showed, for instance, that he was in another state on that day. Correct. So it's not that kind of actual innocence claim. What they've done is offer evidence that perhaps invalidates the identification testimony of an eyewitness. Correct. But the other evidence is that there's undisputed evidence that he's at the scene, and there's undisputed evidence that a vehicle associated with him was shot out. Is that right? Two vehicles associated with him. What other evidence should I be focusing on that undermines the actual innocence claim? What, if anything? The statement of Jonathan Whitmore, the person who was on the other side of the street shooting back at him. If you look at both of the statements taken together, they paint a complete picture of what happened, which is something the jury didn't have before it. But at the gateway hearing, we introduced Whitmore's statement. And if you look at them together, it shows a conflict that was brewing for two weeks between— We're not talking about whether the evidence that remains is enough to convict. It's whether or not there's evidence of actual innocence. And I'm just looking to ask whether there's anything else you want us to consider. There's no evidence of actual innocence, Your Honor. Okay. Thank you. You've reserved a couple minutes for rebuttal. I have. We'll hear you then. Okay. Thank you, Your Honors. Thank you. Glenn Garber from the Exoneration Initiative for Tully Hyman. My client is out on bail pending appeal. And he actually just walked in good timing, I guess. But he's coming from upstate. But in any event, this is a what happened case. It's not an identification case. So to your point, Judge Raji, he always conceded that he was on the scene. It was his position, and he stated this when he voluntarily surrendered the day after the crime, that he was shot at and he was a victim and he was not a perpetrator. And the actual innocence inquiry, the Schlupp v. Dello inquiry before the court or the House v. Bell inquiry, focuses on the inquiry in the context of reasonable doubt. So more likely than not that any reasonable juror would have a reasonable doubt. So when she's saying that it's actual innocence, it is, but it's filtered through the standard of reasonable doubt. That would happen any time there was a recantation by a major witness. And we have not recognized that because we're all too mindful that in certain cases, those with nefarious motives can get a witness to recant after the fact. So that has not been enough to satisfy the factual innocence standard. And my particular concern here is that there was an identifying witness who identified him as shooting. She's now recanted, and there's other evidence that casts doubt on her identification. But your client is at the scene of a shooting. He makes a number of inconsistent statements that admit an adverse inference. His car is all shot out. How do we conclude from that that he has made a colorable showing of actual innocence? It's a holistic analysis. And you have to look at the trial evidence and certainly consider the weakness of the trial evidence, and also the new evidence that informs the district court's decision in the Schlupp v. Dello analysis, and look at that whole thing, the whole kit and caboodle. I don't think the law, although recantation evidence is inherently suspect, and there's a lot of law about that, although a lot of the cases that deal with this, when you look at them, they also acknowledge that a recantation, if credible, and you have to look at surrounding circumstances about a recantation, in addition to judging in the context of the whole record, can be very powerful evidence that guts a case to the point where it meets the actual innocence standard. And I don't think — Are you relying on the Hingston statements, too, that you couldn't see from that third-floor window? You couldn't see the crime scene? I'm not for actual — I mean, you could factor that into the actual innocence analysis, but Ellis had been recanting for 15 years in a variety — So are you saying Hingston was right or wrong? I'm saying Hingston was definitely right. We sort of have a pinholster problem here, because what happens when a state court doesn't hold an evidentiary hearing, the district court is relegated to just analyzing the affidavits and the paper record. But if you look at the photo, 3910, the photo from the Friendly Market across the street to the building, and it's got the cones for the shell casings from the 45 and the 9-millimeter, and then you look at the lobby where she was shot and you look up three stories, that's the window the witness was looking out of. And how is it that — if you believe it, but how is it you can say Hingston's right, that you couldn't see that crime scene from that window? What the affidavits say is Hingston did a video analysis, looked at it from different angles. He put in photos that are hard to view, by the way, because they're just black — but saying that through his analysis and looking and having someone stick their head out of a car window, which was the scenario that was portrayed at trial in regard to Mr. Tymon from the state, you couldn't see, and it's impossible. You might say she couldn't have identified Tymon leaning out of the car window because it's too far away. That's different from saying you get no view of the crime scene from that third-story window, not the one in the hallway, but the one right across from the crime scene. Is he right about that? What I'm saying — okay, we believe he is right, and had there been an evidentiary hearing where that video had come forward or Hingston had been able to testify in state court, the district court's not allowed to consider anything but for what's in the state court record, at least on the ineffective assistance. But on this, he said it's impossible based on his viewing and his photographs, and without going there and seeing it or seeing the video, I don't see how we could refute that. Was his opinion as to impossibility based in part on the time of day because it was March, I think, and it was dark, and the photographs are so dark that I can't really see anything except the sign for the Friendly's Market. I mean, it seems to me the line of sight would be quite perfect if you were looking at that window, but it may be — I don't know what his testimony would have been — that you couldn't see who was shooting out of that car because of the dark and the light situation in the hoodie. Well, a couple of things. First of all, the photograph that was offered into evidence in trial, the one we were just talking about, which appears at the record at 3910, that is looking up on an angle, okay? It's not looking down. From the shell casing. So you have to put — that's difficult to say that refutes what Hinkson is saying he saw when he was there. I'm talking about the photographs from the 440. I understand. The Hinkson photographs, I think it's difficult to tell, and I think without an evidentiary hearing and hearing from Hinkson, it's hard to judge that without that being developed, and this is why I was saying it's a pinholster problem. But which way does that cut? I mean, it's surely your burden to demonstrate this. Well, I'm saying it's a pinholster problem in the context of the actual innocence, and then maybe it goes back to what Judge Raji is saying about the focus by Judge Deary was on Ellis and the problems surrounding the case and the recantation, and that is how he analyzed it. So I think what happens is this photograph, the Hinkson thing, gets somewhat marginalized because he's relegated to just the state court record and what that meant as far as his analysis of ineffective assistance, and Hinkson is saying that it's impossible to see it. It was unrefuted, and it was never fleshed out. What about the Contreras and the Burton testimony? Okay, so going back to that trial evidence, I mean, Judge Deary, I think, deals with that very effectively. He talks about why Ellis was so critical. She's the only one who says Tully Hyman is the shooter coming out of this — or in this green car. The others had a variety of problems. I'm just going to get my notes out. Well, they kind of said they saw a green car and there were shots being fired out of the right front passenger seat. Well, they're all over the boards. Contreras, by the way, is protecting Whitmore, who we believe is the true culprit here, and him and other people associated with him were the shooters. She doesn't braze anything about Whitmore until it comes up surprisingly on cross-examination and says she wouldn't have said anything about Whitmore had she not been questioned about it. She also gives a different account than Ellis about the event, and her testimony was dubious, and I think it's clear just from reading it, in addition to what Judge Deary said. Couldn't the jury believe it? Well, if you're talking about reasonable doubt, and that's one of the reasons why I started with this, because this is a situation of what would a rational juror do with this whole body of evidence, which is what Judge Deary had to do. Now, we're back to the Schlepp analysis. We're putting Hinkson aside. That's what he was tasked to do, and when you're dealing with only one witness in a crime scene that is really a mess, a lot going on, four witnesses saying different things about what they saw, nobody putting Mr. Hyman there except one, and that witness recanting repeatedly over a 15-year period. He put himself there. That's what Judge Deary did. No, no. I mean, not saying that. First he said he was in the red car. Then he said he was in the green car. I meant to say as a shooter. I apologize. Okay. He's always conceded he was there. His car had bullet holes in it, which is consistent with his exculpatory statements that he gave to the police. And the issue of the red Acura versus the green Acura, he testified in the grand jury, was green car, Mazda, very clear about that, and there was some registration issue surrounding that that I think explains what that inconsistency was in his comments. But the ballistics, the fact that the guns were in Whitmore's car, which is this thing that's just wafting throughout that never gets resolved, it is a huge problem. And if you look at that trial record and you see that in conjunction with Ellis, who is repeatedly saying Hyman was shooting, and then she recants, and recants under circumstances that it's not just like a, I use people versus Shilatano. It's a state case, but there's obviously a federal law. It's not a crappy recant. It's a recant with substance to it. She said she was with two other people. Those two other people testified at the gateway hearing, and both said she wasn't with them. And the judge credited them in addition to the core of her testimony about the recant, which was that she did not see him and she had lied because she had been put, pressure had been put on her from Whitmore. And that information, although the – She said two guys came up to her the next night that she couldn't identify and threatened her to tell the story, or else something bad was going to happen to her. What Judge Deary does with it, he does not credit that part of it. And I think, you know, they make a big thing out of, you know, Judge Deary labored. He found that she was a liar, you know, in some respects. But what he does do is he struggles with it in a way that you would want a district court to struggle over such an important analysis and whether – what a rational juror would do under the – any rational juror. And that's what he did. And he looked at her testimony and judged in the context of other evidence and found that it was reliable on the core issue. And that's what the innocence finding is based upon. And we can't ignore the fact that this recant in a case where it's essentially a case that boils down to the testimony of Ellis is so important. And I'm not saying it's just a recant, but even – Where would we look to find out whether a fee dispute can amount to an actual conflict under Supreme Court law? Well, what – I don't think – okay, so under – I mean, it talks about a conflict. That's what Strickland talks about and talks about. An actual conflict doesn't limit it to a fee dispute. The usual thing is you're representing two defendants who are, you know, pointing at each other or might. But a fee dispute doesn't seem to be settled by the Supreme Court. It's the kind of thing that can constitute this kind of actual conflict in which you're relying. I think there's a variety of flavors to conflicts. And Armienti – I think if I'm pronouncing that right, it's a district court case. That deals with an attorney who had been investigated, was being investigated by the U.S. Attorney's Office and failed to disclose that fact. And that was considered to be a conflict of interest. So there's a number of conflicts of interest and a financial conflict of interest here. I pocketed the money that should have gone to the investigator and, therefore, didn't put the investigator on to testify is clearly a conflict of interest. And I don't think that we are, you know, limited to, like, you know, the exact flavor of the conflict when we're deciding whether or not a Strickland violation ensued. And I think Woodall – The issue is what's the level of generality that applies? I mean, I don't think – you know, I think it's obvious that if he has a financial incentive to not pursue a particular strategy or line of defense that would be exculpatory and potentially exonerate his client. That is well within the realm of, you know, of a Strickland violation. The problem with, you know, that language, Supreme Court precedent, and this is something that courts have struggled with and still are probably always going to struggle with, how close does it have to be to Strickland? But Mickens – and Mickens' Supreme Court said, possibly in dicta, that the set of contexts in which this principle, actual conflict principle applies, would not really include representation of the defendant that implicates counsel's personal or financial interests. Isn't that what you're arguing? His financial interest? The lawyer's financial interest. He got $1,500, wanted to keep it rather than give it to Hingston. Yes. I hope I'm understanding – you're saying that Mickens precludes that as a type of ineffective – a conflict that could be at the center of an ineffective assistance plan? Mickens suggested that Sullivan perhaps should not be expanded that far. Well, that is, I think, though, in the context of essentially not having to show prejudice and how far – so in multiple representation cases, it's very difficult to ascertain actual prejudice. So this is a relaxed thing. Here, Judge Deary goes farther, though. He does talk about a relaxed standard in conflict cases, but he finds actual conflict here, and he draws from Armienti and Strickland to make his analysis as to why there's conflict here and then points to the fact that the record is unrefuted on this conflict. And what came up on the principle argument, the Sanders affidavit and the information from Hingston was never challenged. So he said there's no other explanation why you wouldn't do this, and this is what he credits Hingston on. It's impossible to see, but there's no evidentiary hearing in state court on that, and it's not refuted, so he relies on that information. And clearly, in this one-witness identification case, not to put on Hingston to say it's impossible to see is clearly a prejudice problem because it would have changed the outcome. And he says that at the end of his decision and breaks that down. So it's not really a Mickens issue, I don't think. And I do think that there's different flavors of ineffective assistance and conflict that draw from Strickland and other cases. And you could look at Second Circuit law to inform your analysis as to whether or not it's a Supreme Court precedent. It's a somewhat fluid analysis, and I think we're clearly within the zone. So I guess I'm ending, but any other questions? But we firmly maintain, as our client did, he's actually innocent. The Schlupp v. Dello standard was met, and some. And clearly, on this record, especially in light of pinholster and the failure of the state court- The evidence has to be of innocence. And then it has to be so compelling that any reasonable juror would have a reasonable doubt. It's not any evidence that could raise a reasonable doubt. Something that could impeach an accomplice witness that showed that he had six other convictions and that they were for violent crimes might be a basis for arguing, well, a juror would have a reasonable doubt, or evidence that he previously lied under oath. But none of that would go to innocence. So it seems to me that the evidence you have to come forward with, the new evidence, has to demonstrate innocence. Then we get to, well, is it the kind that would raise a reasonable doubt? Well, if you look at the whole- I don't know if that's- Well, where's evidence to the contrary? Because I'm having trouble finding a case in which the actual innocence standard has been satisfied by anything other than something that put the defendant at a different place, or was an admission by another person, or something that compelling. I don't think the law is that the defendant has to come forward with affirmative evidence of innocence to be allowed to have his case analyzed under the Schlupf-Fidello analysis, I think. It is reasonable doubt- Something to look at that would show that so that I can do that. I just think that that's going to- I don't think there's any cases that would ever say that. It just doesn't come up. We start with the Supreme Court saying over and over again, including recently, that this will be a rare circumstance where the gateway innocence standard will be satisfied. Yeah, absolutely. And the cases where it's been satisfied seem to fit the pattern that I've described to you, unless I'm overlooking something. I do think it's fact-based. And in a case where it boils down to one witness, Ellis. I mean, there's other things. But essentially, when you're dealing with the gravamen of the case, and she's recanted, and the court credits that recantation. And that finding is supportable and adopted by this court, and I think it should. I think as a matter of law, that is all that's required. And I just don't think requiring a defendant to come forward with affirmative evidence of innocence is a- can ever be. Because every case has different contours. And if you're having someone who- it's a what happened case. He's putting himself on the scene, and he's saying I was a victim. I just think that to say, well, look, if this was an alibi, maybe you'd be in a better place. I think to parse it that way goes down a dangerous path. But I don't have a case, though, which I wish I had, to say, look. And there might be some district court case somewhere in the country where this similar scenario has arisen. I just don't have one at my fingertips. Thank you. Thank you. We will hear rebuttal. My adversary is- I'm sorry. My adversary is actually asking this court to change the law on actual innocence. It is, as the court pointed out, a requirement that you show actual affirmative evidence of innocence, such as a third-party admission, something wrong with the forensic evidence, and a third-party admission or that the defendant was someplace else. Aren't you changing your ground as to what he would be innocent of? I mean, this was tried on the basis that he was shooting out the window of the green Mazda. And as I heard you on your initial argument, you were saying that, well, maybe he didn't, but he has to show that he wasn't even aiding and abetting. No, Your Honor. He wasn't even driving and so on. No, Your Honor. I'm not changing our theory. Our theory was from the very beginning that he acted as a principal and or an accomplice in this shooting, either under a depraved indifference theory, a killing fields theory, or traditional shooting into a crowd theory. And the jury was charged on the latter, although it wasn't charged on the former. But it doesn't really matter in this context because the inquiry isn't, did the evidence show beyond a reasonable doubt that he was guilty? At this point, it's, has he shown enough evidence of actual affirmative evidence, imminent innocence, excuse me, to warrant the very, very rare remedy of what the Schlupp claim allows. So it doesn't matter here whether he's guilty under this theory or that theory. The fact is, is that he participated in the shooting that left an innocent bystander dead in the middle of the street. If there are no further questions, thank you. Thank you both. We'll reserve decision.